**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**UNITED STATES OF AMERICA**
<u>ex</u> <u>rel.</u> **JOHN D. KING,**

      **Plaintiff,**

**v.**                                                   **Case No: 8:08-CV-2416-T-23EAJ**

**DSE, INC., <u>et al.</u>,**

      **Defendants.**

_____/

**<u>REPORT AND RECOMMENDATION</u>**

Before the Court are Defendants DSE, Inc. and DSE Fuzing, LLC's **Motion for Terminating Sanctions** (Dkt. 232) and Relator's **Response** (Dkt. 249).[1] Following an evidentiary hearing and review of the parties' post-hearing submissions (Dkts. 270, 271),  it is recommended that the motion be **GRANTED**.

Defendants DSE Inc. ("DSE Inc.") and DSE Fuzing, LLC ("DSE Fuzing") (collectively "DSE") seek dismissal of John D. King's ("Relator's") claims with prejudice pursuant to the inherent authority of the Court and Rule 37 of the Federal Rules of Civil Procedure for the alleged spoliation of evidence and Relator's failure to comply with this Court's orders and his discovery obligations.  The Government has filed a Statement of Interest (Dkt. 247), and Defendants Kaman Precision Products, Inc. ("Kaman"), JKS Industries, Inc. ("JKS"), and GTI Systems, Inc. ("GTI") join in support of the motion. (Dkts. 240, 241, 242)

---

[1]   This matter has been referred to the undersigned for a report and recommendation. (Dkt. 243) <u>See</u> 28 U.S.C. § 636(b) (2009).

**Background**

In December 2008, Relator filed a complaint alleging that Defendants DSE, JKS, Kaman, and GTI (collectively "Defendants") violated the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)-(3) by submitting false and fraudulent claims for payment for their production of allegedly defective 40 millimeter ("mm") grenades, components, and parts for the United States.

Relator contends that Defendants falsely certified that 40 mm grenades, components, and parts manufactured for military grenade launchers were performing properly and could be safely used in military combat and during military exercises. (Dkt. 28 at 4)  Relator maintains that the grenades, components, and parts, however, were "not combat-worthy, were unsafe, should not have been used for military combat and/or military exercises, placing, and continue to place military personnel in bodily danger;" were "assembled with components, parts, and/or structural elements that were manufactured in violation of contract specifications;" and "were not verified through appropriate quality assurance processes and competent and/or ethical quality assurance personnel." (Id. at 4-6)  Relator submits that Defendants conspired to defraud the Government by producing non-military grade, nonconforming, and defective 40 mm grenades.  (Id. at 6)

Relator also contends that DSE Fuzing wrongfully terminated Relator from his position as DSE Fuzing's Quality Assurance Manager in violation of 31 U.S.C. §  3730(h) after Relator reported the fraudulent conduct to internal personnel and refused to certify that the 40 mm grenades met specified requirements. (Id. at 7)

## I.     Discovery Background

In an attempt to obtain Relator's full compliance with its first requests for production served in August 2011, DSE sent three letters to Relator's attorney, Craig James ("Attorney James"), in

February 2012 and April 2012. (Dkt. 232 Ex. 5)  On January 5, 2012, the Court granted Defendants' motion to compel Relator to appear for a deposition exceeding seven hours. (Dkts. 126, 129) Defendants deposed Relator for six hours on January 11, 2012 and noticed another deposition for Relator on April 18, 2012.  After Relator refused to appear for his noticed deposition on April 18, 2012, GTI, joined by the remaining Defendants, moved to compel Relator's attendance at deposition. (Dkts. 135, 136, 142, 144)  On April 23, 2012, JKS moved to compel Relator to respond to its interrogatories and document requests served in January 2012. (Dkt. 139)  A week later, on April 27, 2012, Attorney James requested to withdraw as Relator's counsel, and the Court granted the motion on May 14, 2012. (Dkts. 145, 150)

On May 15, 2012, the Court granted GTI's motion to compel Relator's attendance at deposition, granted JKS's motion to compel Relator to respond to discovery requests, and directed Relator to show cause for his failure to file a response to either of these motions. (Dkts. 151, 152) Relator ignored the Court's orders to show cause.  The Court subsequently imposed monetary sanctions against Relator in favor of JKS and GTI for these violations.[2] (Dkt. 268)  At the evidentiary hearing, Relator admitted that after receiving the Court's order, he made no attempt to locate the discovery requested by JKS.  (Dkt. 266 at 13-16)

On May 20, 2012, while unrepresented by counsel, Relator sent an unsolicited email to Defendants revealing the existence of "countless hours" of "very damaging" video diaries. (Dkt. 232 Ex. 4)  In his email, Relator addressed the production of his outstanding discovery, noting that:

This "data dump" will include everything except the countless hours of video I

---

[2]   The Court subsequently imposed monetary sanctions of attorneys' fees against Relator in the amount of $1,363.50 to JKS and $2,654.00 to GTI.  (Dkt. 268)  Relator filed a Notice of Compliance stating that he paid these amounts in full on December 22, 2012. (Dkt. 272)

> digitally recorded going back as far as I can remember describing what happened at that time and breaking everything down in detail the key points of the day trying to analyze the current tasks at hand and develop a short term plan moving forward. It is kind of a video diary if you will. I won't send this to you because it is everything I have broke [sic] down in simple language, even my thoughts, some personal that would be very damaging to my case. But, more importantly, I believe it would not be to the best interest of the United States of America and maybe even a risk in some way to national security.  Since I am not a lawyer and don't have representation at this time, I believe this to be the case, therefore I would require a court order from the Judge for me to turn over that material.

(Id.)

In this email, Relator also represented to Defendants that he was sending other requested documents to Defendants.  (Id.) Because Defendants never received this production, DSE sent an email to Relator's new attorney, David Linesch ("Attorney Linesch") on June 6, 2012. (Dkt. 232 Ex. 5) However, Attorney Linesch informed Defendants that he was withdrawing from his representation of Relator. (Dkt. 159)

On June 13, 2012, Relator sent DSE responses to interrogatories stating that he would mail documents to Defendants on or about June 15, 2012. (Dkt. 165 Ex. 8 at 4, 6)  On June 20, 2012, Relator served supplemental responses to DSE's first request for production.  (Dkt. 232 Ex. 7)  In response to each of DSE's ninety-six requests, Relator provided the same response:

> This information has already been provided (if it exists) to all of the defendants counsel, including DSE's counsel in the Relator's Production of Documents #1, #2, #3, and/or #4. The Relator's Production of Document's [sic] #4 is a copulation [sic] of all data and electronic documents (which includes documents in their native formats and scanned pdfs of any and all hard copy documents in the Relator's possession) that is even remotely related to this lawsuit. The Relator provided backups of all personal computers in use, or that were in use during the period, laptops and servers [sic] as part of the forth [sic] production of documents, that was mailed on about June 20, 2012. This is everything that he [sic] Relator can produce, if the item requested exists, thus this answer must be the same for all questions asked from this point forward.

(Id.)

4

On June 21, 2012, the Court granted Relator's motion for withdrawal of his sixth counsel in this case, warning that: "King both represents the United States and acts as a partial assignee of the United States' putative claim. Hence King must proceed competently and expeditiously in the public's interest. Instead, King causes frequent delay and disruption; he switches counsel often and he obstructs discovery. This is the final warning." (Dkt. 160)

Michael Tuma ("Relator's counsel") filed his notice of appearance on behalf of Relator on June 29, 2012. (Dkt. 163)   On July 2, 2012, Defendants received from Relator a package of encrypted, unaccessible, and damaged CDs.  (Dkt. 232 Ex. 8)  On July 9, 2012, DSE filed a motion to compel Relator's full compliance with DSE's first production of documents and production of the video diaries. (Dkt. 165)   At Relator's counsel's office on July 12, 2012, DSE technicians collected a number of requested documents from Relator's computers.   After DSE asked if Relator would be producing the video diaries, Relator's counsel stated that he did not have the video diaries and was not producing the video diaries. (Dkt. 249 Ex. 8 at 13)

## II.    The Alleged Disappearance of the Video Diaries

At the September 6, 2012 hearing on DSE's Motion to Compel (Dkt. 165), the Court asked about the video diaries, one of the items at issue in the motion.  Relator's counsel proffered that at some point between Relator's May 20, 2012 email and the September 6, 2012 hearing, a burglar tampered with files on Relator's computer and that Relator's attempts to retrieve the destroyed or corrupted files were unsuccessful. (Dkt. 234 at 30-31)   In response to the Court's inquiry, Relator's counsel affirmed that Relator filed a police report in connection with the burglary. (Id. at 31)

5

The Court granted DSE's motion to compel and awarded monetary sanctions,[3] reserved ruling on other sanctions, ordered Relator to produce the video diaries, as well as book materials, black belt certificates, and tax returns and sua sponte ordered Relator to produce a copy of the police report regarding the burglary.  (Dkt. 224)

In response to the Court's order, Relator provided copies of an April 29, 2012 police report, his affidavit dated October 2, 2012,  Attorney James' affidavit, emails exchanged on May 14, 2012 between Relator and Assistant U.S. Attorney Charles Harden ("Attorney Harden"),[4] and a June 1, 2012 police report. (Dkt. 232 Ex. 14-16) (Dkt. 249 Ex. 10)

The first police report reveals that on April 29, 2012  Relator's ex-girlfriend, Shelly Castel ("Castel"), reported to police that Relator had "brandished a firearm" and threatened to shoot her and her daughter. (Dkt. 232 Ex. 14)  The June 1, 2012 police report recounts Relator's complaint to local police that he believed that Castel hacked his Internet accounts. (Dkt. 232 Ex. 15)  Relator also submitted a handwritten statement to police dated June 1, 2012 accusing Castel of stealing "property of mine, including $1000 cash." (Def's Ex. T)[5] Neither police report mentions a burglary and loss of computer files at Relator's residence.

As a result of the April 29, 2012 incident, Relator was arrested, spent two nights in jail, and returned home on May 1, 2012.  In his affidavit, Relator explained that while he was in jail, two of Castel's friends helped her move out of his home. (Dkt. 249 Ex. 10 at 7)  Relator asserted that

---

[3]  The Court subsequently imposed monetary sanctions in the amount of $7,398.31 in attorneys' fees and costs against Relator in favor of DSE.  (Dkt. 269) Relator filed a Notice of Compliance stating that he paid this amount in full on December 22, 2012. (Dkt. 272)

[4]  Attorney Harden is counsel for the United States in this matter. The Government declined to intervene in this case on August 17, 2010. (Dkt. 17) However, its counsel remains of record.

[5]  This exhibit was admitted into evidence at the evidentiary hearing.

6

"[b]oth individuals have questionable reputations and make their income 'off the streets.'" (Id.)

> Further, Relator stated under oath:

> When I returned [home] with Mr. James bailing me out of jail, the house was locked and I was not provided a key. I had to break into my own home finding both keys to my home missing . . . the lights left on in my car . . . and even the tires slashed on my bicycle. The house was in total disarray, money was missing, and items were stolen. . . . I immediately spent the next several day[s] installing a security alarm in the home . . . [i]t wasn't until a week or so later after reassembling my network of computers that I discovered that my external drive with the video diaries was taken, along with $1,000 and the cell phone that was submerged in water. . . . I immediately reported it to the federal authorities . . . Mr. Harding [sic] replied and instructed me that they were not part of the protective order for the confidential documents and that I should report this incident to the local authorities, which I did.[6]

(Id.)

According to this chronology, Relator would have discovered that the video diaries were missing by at least mid-May since he was released from jail on May 1, 2012.

However, at the subsequent evidentiary hearing, Relator testified that he did not report the stolen hard drive with the video diaries to local police or federal authorities because he did not discover its disappearance until the second week of June 2012. (Dkt. 270 Ex. 2 at 71-72, 81)  He testified that because Castel's two friends ("Cookie" and "Cuz") helped Castel move out of Relator's

---

[6] In his May 14, 2012 email to Attorney Harden, Relator reported, in pertinent part, that:

> I was falsely accused of pulling a gun by the same Shelly Castel a week or so later putting me in jail. . . . At that time, critical information as it relates to my case and documents under a protective order were compremised [sic] by Shelly and possibly others. My computers were hacked using spy ware (I discovered later) and my gmail account was hacked removing all emails between Ms. Castel and I. I recovered some of those emails, but you can tell that they are not on the email server.

(Dkt. 232 Ex. 15)

> Tellingly, there is no reference in the May 14, 2012 email to the loss of the external hard drive containing the video diaries or any alleged burglary of his residence.

home, he surmised that they "pocketed" the external hard drive.[7] (Id. at 78-79)

Relator insisted that his home was burglarized, stating that Castel "left the house emaculate [sic] and when I returned the house was – was in disarray and looked like it had been burglarized, so I felt that it was either Cookie or Cuz that stole that – that merchandise or – or someone did break in." (Id. at 80)   Relator alleged at the hearing that the missing items included $1,000 in cash, an Ipod, a cell phone, the external hard drive, "a few trinkets," and "little pieces of electronics." (Id. at 70-71)  Relator's laptops and the hard drive were on the dining room table in full view, although the laptops were not taken. (Id. at 56)  Relator testified that his home had been broken into several times in recent years and when he returned home from jail on May 1, 2012, he had little difficulty getting into his home without a key. (Dkt. 266 at 57-59) (Dkt. 270 Ex. 2 at 85-86) Although Relator regularly backed up the rest of his data, he did not back up the video diaries and never disclosed the existence of the video diaries to anyone, including his attorneys.  (Dkt. 270 Ex. 2 at 20, 95)

Relator testified that the hard drive never left his briefcase. (Id. at 42)  Inexplicably, when asked by the Court to confirm that he kept the hard drive in his briefcase, Relator responded that: "It's in my briefcase in my case right now, yes." (Id. at 124-25)  Relator then further explained, "I mean, not that one, but the one I'm using now and, you know, the information that's on there." (Id.)

III.    **The Contents of the Video Diaries**

Relator stated that he used the video diaries to "talk[] about things that were happening at that time in my life."  (Id. at 21)  Relator also recorded his personal thoughts and views related to his case, including his observations of events occurring during his employment at DSE in April,

---

[7]  Neither Relator nor any of his witnesses actually observed the hard drive being removed from the residence.

May, and June of 2008 and after his termination. (Id. at 19-23)

In late 2008, Relator began recording on the video diaries his technical analysis of the specifics of the case on a whiteboard, using a "six sigma method" called "fish boning," which he described as "how you breakdown an issue, a problem, and you find -- and you come up with all possible solutions." (Id. at 16, 20, 30)   Relator recorded this analysis "to retain what's on the whiteboard before I erased it." (Id. at 17)   Relator explained that his "brainstorm[ing] or fish boning about the problems" on the videos allowed him to document "a lot of the information that was contained in the amended complaint." (Dkt. 266 at 33)[8]

In these recordings, Relator analyzed the Government's waiver and acceptance of the defective grenades, components, and parts. (Dkt. 270 Ex. 2 at 24-25)   Relator discussed the quality assurance problems of Kaman's former Quality Manager, Robert Monahan, and analyzed the fraud that allegedly occurred at Kaman, including "the defects on the bunker buster bomb." (Dkt. 266 at 6-7, 36, 103)   He also discussed the allegedly defective metal finishings that GTI manufactured and supplied to DSE and the defective detents that were incorporated into escapements sold to JKS.[9] (Id. at 8, 18) Regarding the defective detents, Relator stated that:

> The detents are a huge part of our case. And the biggest part of my video diaries and discussions were, you know, with the given defect that's even on the defendant's website now, they claim that the detent's flat, which means it's not conforming, it's defective. I was doing calculations and technical analysis to determine, you know, with a detent of this size and -- I mean, I was doing engineering, you know, and how

---

[8]   As Defendants point out, the amended complaint is bereft of any calculations, engineering, or technical analysis of the allegedly defective military equipment.

[9]   A detent is "a very small zinc base alloy die cast part" that "provides a critical function for the safe and reliable arming of the 40 mm grenade." (Dkt. 28 at 33) An escapement is the "core of the fuse and provides all the functionality for the safe and reliable arming of the 40 mm grenade." (Id. at 35) The fuse is the "safety and arming device of the grenade." (Id. at 4)

would this affect it, and had already concluded that it was a safety hazard, you know, it would cause duds or failures, which has been concluded by reports from the Army that's now in part of our evidence. So I did a lot of this work in preparation of [sic] writing the amended complaint and the request for production because I had figured out what I needed to know to go to that next step.

(Id. at 96)

The video diaries contained details of allegations in Relator's amended complaint, including: a meeting on quality issues and contractual violation issues with Jack Robertson on June 23, 2008; an observation on June 6, 2008 that inspectors were falsifying inspection worksheets; a June 3, 2008 short fuse test; and his May 28, 2012 observation of "a production supervisor shak[ing] out defective escapements back into the production line." (Dkt. 270 Ex. 2 at 31-35)  Relator admitted that he also documented his contacts with the Government after his termination and his motivation for bringing this lawsuit, but claimed that he did not discuss the circumstances of his termination.  (Id. at 35-36)

Relator testified that he was "completely responsible" for discovery and produced the documents "to the best of my ability" and with "very little input from my attorney." (Id. at 45) Relator agreed that the video diaries were responsive to discovery requests served in August 2011 and January 2012.  (Dkt. 266 at 11-13) (Dkt. 270 Ex. 2 at 44-51)   Alleging that the disclosure of the video diaries posed a risk to national security, Relator "wanted the court to intervene because I thought there was maybe risk of national security. . . . There was some sensitive information that may be comprising to the national security of the United States of America."[10] (Dkt. 266 at 28) Despite Relator's claim that he needed guidance from his attorney or the Court before producing the video diaries, he made no effort to have the video diaries evaluated to determine whether they could

---

[10] However, Relator never sought to invoke any privilege or request in camera review of any information in the video diaries.

be produced.  He sought no protective order from this Court to prevent their disclosure nor did he

turn them over to the Government.  (<u>Id.</u> at 113-15)  Relator knew of the protective order entered in

this case and the production of documents designated as "attorneys eyes only," but did not avail

himself of these protections. (<u>Id.</u> at 120-23)

In an effort to explain why he told Defendants in the May 20, 2012 email that the disclosure

of the video diaries would be "very damaging to his case," Relator testified that the video diaries

contained sensitive and confidential information and their production would be "scandalous" or

"embarrassing" to the Government, causing the Government to decline to intervene.[11]  (<u>Id.</u> at 36-37,

110) Relator's efforts to explain away his email description of the video diaries as "very damaging"

to his case are unworthy of belief. (<u>Id.</u> at 36-37)  Relator overlooks that at the time he sent the May

20, 2012 email, the Government had already declined to intervene and the complaint had been

unsealed.  (Dkts. 17, 24)

### <u>Discussion</u>

Defendants contend that dismissal is warranted pursuant to the inherent authority of the

Court and Rule 37 of the Federal Rules of Civil Procedure for the alleged spoliation of evidence and

Relator's failure to comply with this Court's orders and his discovery obligations.  Relator responds

that the video diaries are not crucial to Defendants' defense, he has not exhibited bad faith because

---

[11]  Relator explained at the evidentiary hearing:

Because at -- very early on I understood that if the government didn't intervene in your case, that you had almost zero chance of winning a false claims act. And the information that I presented I thought would be very sensitive to people within the government that would basically not be the best interest of news getting out.

(Dkt. 266 at 36-37)

the disappearance of the hard drive was due to an intervening criminal act, and he has endeavored to provide discovery efficiently and in compliance with the orders of this Court and the Federal Rules of Civil Procedure.

## I.   Spoliation

Spoliation is "the destruction of evidence or the significant and meaningful alteration of a document or instrument." Green Leaf Nursery v. E.I. DuPont de Nemours & Co., 341 F.3d 1292, 1308 (11th Cir. 2003) (internal quotation marks omitted).  Because spoliation sanctions constitute an evidentiary matter, federal law governs their imposition.  Flury v. Daimler Chrysler Corp., 427 F.3d 939, 944 (11th Cir. 2005).  Sanctions for spoliation are appropriate only when there is evidence of bad faith.  Id. Mere negligence in losing or destroying records is not enough for an adverse inference instruction.  Bashir v. Amtrak, 119 F.3d 929, 931 (11th Cir. 1997).

Although federal law controls spoliation sanctions, the Eleventh Circuit has not set forth specific guidelines on the imposition of such sanctions. Se. Mech. Servs., Inc. v. Brody, 657 F. Supp. 2d 1293, 1299 (M.D. Fla. 2009).   Thus, courts may look to state law principles for guidance so long as the principles are consistent with federal spoliation principles.  Id.  Under Florida law, spoliation is established when the party seeking sanctions proves that: (1) the evidence existed at one time, (2) the alleged spoliator had a duty to preserve the evidence, and (3) the evidence was crucial to the movant's prima facie case or defense.  Id.  Spoliation sanctions include, but are not limited to, the entry of a default judgment, the striking of pleadings, an adverse inference or rebuttable presumption instruction to the trier of fact, or the assignment of fees and costs stemming from the spoliation.  Swofford v. Eslinger, 671 F. Supp. 2d 1274, 1280 (M.D. Fla. 2009).

### A.   Existence of the Evidence and Duty to Preserve

Once a party reasonably anticipates litigation, it has an obligation to make a conscientious effort to preserve electronically stored information that would be relevant to the dispute. Se. Mech. Servs., Inc. v. Brody, No. 8:08-CV-1151-T-30EAJ, 2009 WL 2242395, at *2 (M.D. Fla. Jul. 24, 2009). Defendants have shown that the video diaries existed during this litigation and contained information relevant to this case.  In fact, there is no factual dispute as to these issues.  Thus, Relator had a duty to preserve the video diaries.

### B.      Bad Faith

There is overwhelming evidence of Relator's bad faith.  While admitting that the video diaries were responsive to multiple discovery requests served in August 2011 and January 2012, Relator did not disclose the video diaries' existence to anyone until his May 20, 2012 email to Defendants, which was twelve days before the discovery deadline in this case, and then he refused to produce the video diaries in discovery.  Even if credible, Relator's belief that the video diaries contained allegedly sensitive information posing a risk to national security does not excuse Relator from discovery compliance. See Maus v. Ennis, No. 6:10-cv-1904-Orl-31DAB, 2011 WL 6319176, at *5 (M.D. Fla. Dec. 1, 2011) (finding that the defendant's claimed involvement in major national and international security matters was not a legitimate claim of privilege).  The Court finds that Relator intentionally withheld and refused to produce the video diaries without adequate justification.

Even assuming that Relator discovered that the video diaries were missing in mid-June (and not mid-May as suggested in his affidavit), Relator failed to disclose this to the Court or opposing counsel.  When he notified opposing counsel at a meeting in mid-July that he did not have the video diaries, he never mentioned any alleged burglary.  Relator waited five months– from May 1, 2012

to September 6, 2012–to notify the Court of the alleged burglary compromising files relevant to this litigation and subject to the Court's protective order.

Most significantly, Relator's multiple conflicting representations to the Court in connection with the alleged disappearance of this evidence demonstrate his bad faith.  Initially, on September 6, 2012, Relator informed the Court that the video diary files were destroyed or corrupted on his computer during a burglary, but later Relator claimed that his home had been burglarized and an external hard drive containing the video diaries was stolen.  Also on September 6, 2012, Relator stated that he filed a police report regarding the alleged burglary.  Similarly, he stated in his affidavit that he immediately reported the missing hard drive to federal authorities and then to local authorities.  Relator did not produce any police reports documenting the alleged May 1, 2012 burglary.  Instead, he produced a set of documents dated April 29, May 14, and June 1, 2012 that fail to corroborate the theft of an external hard drive.  Subsequently, Relator testified at the evidentiary hearing that he never notified the local police or federal authorities that the hard drive was missing and did not learn that the hard drive was missing until mid-June 2012.  His testimony that he discovered the loss of the hard drive in mid-June contradicts Relator's chronology of events in his affidavit stating he discovered the disappearance of the hard drive in mid-May.[12]

Relator asserts that he kept the hard drive in his briefcase at all times because it contained sensitive, critical, and personal information, yet he asks the Court to believe that he did not discover that the hard drive was missing for six weeks after the alleged burglary.  Relator failed to take any

---

[12]  In an attempt to reconcile this discrepancy, Relator explained that in his affidavit when he said that he spent "several days" installing security around his home, that actually meant "two to three weeks." (Dkt. 270 Ex. 2 at 72-74)  Even if this explanation were credible, which it is not, this would tend to show his discovery of the loss of the hard drive in late May 2012.

14

precautions to preserve the video diaries, and although Relator knew the identity of the alleged culprits, he made no effort to recover the hard drive or report its theft.

Relator intentionally withheld the video diaries from discovery production without adequate justification, willfully disregarded his obligation to preserve or back-up this evidence, and offered multiple contradictory versions of the events resulting in their alleged disappearance. His explanation for the alleged loss of video diaries is unworthy of belief and is an attempt to mislead the Court and opposing counsel about this evidence. Even if his multiple inconsistent statements about the loss of the evidence were credible, which they are not, Relator could have, and should have, produced this evidence to Defendants long before the events of May and June 2012. He alone is responsible for his alleged inability to produce this evidence.

### C.   Prejudice to Defendants

Evidence is not crucial if it is available from an alternate source or if the claim or defense to which it relates is adequately supported by alternate evidence.[13]  See Lockheed Martin Corp. v. L-3 Commc'ns Corp., No. 6:05-cv-1580-Orl-31KRS, 2007 WL 3171299, at *2 (M.D. Fla. Oct. 25, 2007); see also In re Elec. Mach. Enters., 416 B.R. 801, 875 (Bankr. M.D. Fla. 2009). However,

---

[13] While Flury, 427 F.3d at 944, does not require a district court in a case based on federal question or false claims jurisdiction to apply state law to spoliation claims, see F.T.C. v. First Universal Lending, LLC, 773 F. Supp. 2d 1332, 1351 (S.D. Fla. 2011), some courts within the Eleventh Circuit have applied state law to require that the alleged spoliated evidence be crucial to a party's claims or defenses before imposing spoliation sanctions, even in cases based on federal question jurisdiction. See Santana v. RCSH Operations, LLC, No. 10-61376-CIV, 2011 WL 688723, at *4 (S.D. Fla. Feb. 18, 2011) (finding the alleged spoliated evidence not crucial to defense of claims under Fair Labor Standards Act and Title VII of the Civil Rights Act of 1964 ("Title VII")); Lockheed Martin Corp., 2007 WL 3171299, at *2 (noting that the defendant failed to establish that the missing evidence is crucial to its claims or defenses in action brought pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)); Floeter v. City of Orlando, No. 6:05–cv–400–Orl–22KRS, 2007 WL 486633, at *6 (M.D. Fla. Feb. 9, 2007) (finding missing evidence not crucial to claims of sexual harassment under Title VII).

15

"courts must not hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence because doing so allows the spoliators to profit from the destruction of evidence." Se. Mech. Servs., Inc., 657 F. Supp. 2d at 1300 (citation omitted); see also Victor Stanley, Inc. v. Creative Pipe, Inc., 269 F.R.D. 497, 502 n.7 (D. Md. 2010) (noting the "Catch 22" in evaluating spoliation sanctions because "after evidence no longer exists, it often is difficult to evaluate its relevance and the prejudice associated with it.")

If the circumstances surrounding the evidence's absence indicate bad faith, it can be inferred that missing evidence was unfavorable. Bashir, 119 F.3d at 931 (stating that the court "will not infer that the missing speed tape contained evidence unfavorable to appellees unless circumstances surrounding the tape's absence indicate bad faith, e.g., that appellees tampered with the evidence."); see also Swofford, 671 F. Supp. 2d at 1282 (inferring that the spoliated evidence would have been unfavorable after finding that the defendants acted in bad faith by knowingly and willfully disregarding their obligation to preserve evidence); Telectron, Inc. v. Overhead Door Corp., 116 F.R.D. 107, 133 (S.D. Fla. 1987) (noting that "the bad-faith destruction of a relevant document, by itself, gives rise to a strong inference that production of the document would have been unfavorable to the party responsible for its destruction." (internal quotation marks omitted)).

Relator conceded in his May 20, 2012 email to Defendants that his video diaries contained information that would be very damaging to his case. Defendants contend that the loss of the video diaries is prejudicial because some of the evidence will be based on Relator's testimony alone, and the video diaries are critical to his credibility. Additionally, because the video diaries admittedly contain Relator's technical analysis, Defendants have no ability to evaluate the analysis with their experts.

Relator contends that the video diaries are merely cumulative as the content of the video diaries has been disclosed in the amended complaint, the deposition of Relator, and other documents produced.  Asserting that he has produced thousands of documents and hundreds of emails, Relator states that there are other tangible documents and multiple witnesses evidencing his concerns about the quality assurance issues.

The Court rejects Relator's assertion that no significant prejudice resulted from Relator's conduct.  Relator's efforts to distance himself from the admission that the video diaries contained information "very damaging" to his case and his incredulous explanation for the disappearance of this evidence further reinforce the importance of the video diaries.  If the video diaries were merely cumulative, and all the relevant information in them was contained in the amended complaint, Relator would not have gone to such great lengths to withhold this evidence.  The circumstances surrounding the alleged disappearance of the video diaries amply justifies a finding that this evidence is unfavorable to Relator's case and crucial evidence for Defendants.  In sum, all elements of a spoliation claim have been met.

## II.      Obstruction of Discovery

Throughout this litigation, Relator's conduct has prejudiced Defendants' ability to conduct discovery and defend against Relator's allegations.[14]  Relator has engaged in frequent and multiple changes in counsel, represented to Defendants that he was sending documents to Defendants that were never received, and sent Defendants damaged and encrypted CDs.  Defendants had to seek

---

[14]  A portion of Relator's conduct is also the subject of a pending motion for contempt. At the evidentiary hearing, Defendants objected to Relator's presentation of evidence regarding his compliance with the entire discovery process.  The Court overruled Defendants' objection and advised the parties that the totality of Relator's conduct was at issue. (Dkt. 271 Ex. 2 at 84)

Court intervention for Relator to appear at deposition, to respond to interrogatories and requests for production of documents, and to supplement discovery.

As a result, the Court has granted four separate motions to compel against Relator for his obstruction of discovery and has, on three occasions, awarded monetary sanctions against him in favor of three separate Defendants. Without adequate justification, Relator failed to respond to the Court's show cause orders and willfully disregarded his obligation to even look for court-ordered discovery. Relator's failure to comply with his obligations is not due to simple negligence, misunderstanding, or an inability to comply. Relator willfully ignores court orders and his discovery obligations without adequate justification.

## III.   Sanctions

Federal Rule of Civil Procedure Rule 37(b)(2) grants the court broad authority in sanctioning a party for failure to comply with a court order to provide discovery. Gratton v. Great Am. Commc'n, 178 F.3d 1373, 1374 (11th Cir. 1999) (per curiam); Fed. R. Civ. P. 37(b)(2). Rule 37 sanctions are imposed not only to prevent unfair prejudice to the litigants but also to insure the integrity of the discovery process. Aztec Steel Co. v. Fla. Steel Corp., 691 F.2d 480, 481 (11th Cir. 1982). Discovery is intended to be largely extrajudicial, as motion practice is expensive and time consuming. "It is not the court's role, nor that of opposing counsel, to drag a party kicking and screaming through the discovery process." U&I Corp. v. Adv. Med. Design, Inc., 251 F.R.D. 667, 676 (M.D. Fla. 2008).

Because dismissal with prejudice is considered a drastic sanction, a district court may implement it as a last resort only when: (1) a party's failure to comply with a court order is a result of willfulness or bad faith; and (2) less drastic sanctions would not ensure compliance with the

court's orders. Malautea v. Suzuki Motor Co., 987 F.2d 1536, 1542 (11th Cir. 1993) (noting that "[v]iolation of a discovery order caused by simple negligence, misunderstanding, or inability to comply will not justify a Rule 37 default judgment or dismissal.")    Similarly, spoliation sanctions disposing of a claim are appropriate only where lesser sanctions will not suffice. Flury, 427 F.3d 939 at 944.

A court may also impose sanctions for litigation misconduct under its inherent power. Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991). The court's inherent power derives from the court's need "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." Link v. Wabash R. Co., 370 U.S. 626, 630-31 (1962).  "The key to unlocking a court's inherent power is a finding of bad faith." Barnes v. Dalton, 158 F.3d 1212, 1214 (11th Cir. 1998). "A party demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." Id.   When there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the rules, the court ordinarily should rely on the rules rather than its inherent power, but "if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power."  Chambers, 501 U.S. at 50.

The Court finds that no lesser sanctions, other than dismissal, will suffice to address the gravity of Relator's conduct and the prejudice to Defendants.  Repeated warnings about the necessity of complying with rules, discovery requests, and court orders have not changed Relator's conduct. The Court provided Relator with a "final warning" on June 21, 2012 regarding his frequent delay, disruption, and obstruction of discovery. Although the Court has imposed monetary sanctions to compensate Defendants involving other discovery violations, these sanctions did not deter Relator's litigation misconduct.  Now, after hours of testimony at an evidentiary hearing and briefing by both

19

sides, Relator's conduct involving the video diaries is beyond the remedial power of monetary sanctions or any other sanction short of dismissal.[15]

The allegations that Relator has made under the FCA are very serious and involve alleged defective equipment used by U.S. military personnel.  However, Relator has, due to his own conduct, forfeited his right to a determination on the merits.  Relator's conduct goes beyond the spoliation of evidence.  Dismissal of all claims with prejudice is warranted in this case due to Relator's persistent pattern of willful and bad faith litigation misconduct, his unwillingness to comply with the civil rules and orders of this Court, and a flagrant disregard for the discovery process throughout this litigation.  Dismissal is the only sufficient sanction to compensate Defendants for the prejudice caused by Relator, meaningfully hold Relator accountable for his conduct, and to deter future similar acts of willful disregard for the discovery process.  See Shortz v. City of Tuskegee, 352 F. App'x 355, 359-60 (11th Cir. 2009) (unpublished) (per curiam) (affirming dismissal for failure to produce discovery, respond to the court's orders, and provide any compelling justification the failure to comply);[16] Gratton, 178 F.3d at 1375 (affirming dismissal due to willful noncompliance with civil rules and the court's orders and the spoliation of evidence); Carlucci v. Piper Aircraft Corp., 102 F.R.D. 472, 488 (S.D. Fla. 1984), aff'd in part, rev'd in part, 775 F.2d 1440 (11th Cir. 1985) (entering default for consistently disobeying orders, obstructing discovery, delaying proceedings, and making misrepresentations to the court).  Dismissal of all of

---

[15]  As Relator has already admitted that the video diaries are "very damaging" to his case, an adverse inference instruction that the content of the video diaries would be unfavorable to Relator would not aid Defendants or deter future similar conduct by Relator.

[16]  Unpublished opinions of the Eleventh Circuit Court of Appeals are not considered binding precedent; however, they may be cited as persuasive authority. 11th Cir. R. 36–2.

Relator's claims as to all Defendants is appropriate.  See Aztec Steel Co., 691 F.2d at 481.

The Government  "takes no position as to the factual allegations set forth in DSE's motion or as to the relief [D]efendants seek, except to the extent that the motion seeks a dismissal with prejudice as to the United States." (Dkt. 247)  The Government requests that if the Court dismisses this action, it does so without prejudice to the United States because Defendants seek dismissal for the Relator's alleged procedural misconduct, not on the merits of the case. (Id.)  Accordingly, it is recommended that this case be dismissed without prejudice as to the Government.  See U.S. ex rel. Williams v. Bell Helicopter Textron, Inc., 417 F.3d 450, 455-56 (5th Cir. 2005) (affirming the district court's dismissal of the plaintiff's qui tam complaint for failure to plead with specificity as required by Rule 9(b), Fed. R. Civ. P., but modifying the judgment to be without prejudice to the United States).

**Conclusion**

Accordingly, and upon consideration, it is **RECOMMENDED** that:

(1)     Defendants DSE, Inc. and DSE Fuzing, LLC's Motion for Terminating Sanctions (Dkt. 232) be **GRANTED**;

(2)     This case be **DISMISSED WITH PREJUDICE** as to Relator; and

(3)     This case be **DISMISSED WITHOUT PREJUDICE** as to the United States of America.

**Date: January 17, 2013.**

ELIZABETH A JENKINS
United States Magistrate Judge

**<u>NOTICE TO PARTIES</u>**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of this service shall bar an aggrieved party from attacking the factual findings on appeal.  <u>See</u> 28 U.S.C. § 636(b)(1).